Dera MIRA, Plaintiff,

v.

**MONROE COUNTY SCHOOL BOARD,**
Calvin King, as Director of Mainte-
nance, and Kerry Highsmith, as Di-
rector/Team Leader, Business Manage-
ment Complex, Defendants.

No. 87–10005–CIV.

United States District Court,
S.D. Florida,
Miami Division.

May 31, 1988.

William DuFresne, Miami, Fla., for plain-
tiff.

Michael W. Casey, III, Miami, Fla., for
defendants.

### FINDINGS OF FACT AND
### CONCLUSIONS OF LAW

JAMES LAWRENCE KING, Chief
Judge.

This matter came on for trial before the
Court, and is now before the Court for a
decision on the merits. This suit is an
individual action seeking a promotion and

back pay for alleged unlawful employment practices committed by Defendants in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* [hereinafter referred to as Title VII]. Plaintiff, a current employee of Defendant Monroe County School Board, asserts that she was denied a promotion by Defendants on account of her sex in violation of Title VII. Although the Complaint alleged a variety of sex discrimination claims, the trial was limited, pursuant to the parties' Pretrial Stipulation, to Plaintiff's claim that Defendants denied her a promotion to the position of Assistant Director of Transportation in 1984 and again in 1986 on account of her sex.

After consideration of the testimony, the exhibits, the parties' arguments, the Pretrial Stipulation, and the applicable law, the Court hereby makes and enters its Findings of Fact and Conclusions of Law in accordance with Rule 52, Federal Rules of Civil Procedure. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. Conversely, to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

FINDINGS OF FACT

1. Plaintiff, DERA MIRA, is a female individual over the age of eighteen (18) who is a citizen of the United States of America and a resident of the state of Florida. At all times relevant to this action, Plaintiff resided in Sugarloaf Key, Monroe County, Florida.

2. Defendant MONROE COUNTY SCHOOL BOARD is a Florida school district charged with the administration of the public school system in Monroe County, Florida, and is within the Southern District of Florida. Defendant School Board is engaged in a governmental activity affecting commerce under 42 U.S.C. § 2000e(h).

3. The Monroe County School District [herein, School District] is comprised of thirteen schools and is administratively divided into three geographic areas: the "Upper Keys" area; the "Middle Keys" area, and the "Lower Keys" area. The main office of the School Board is located in Key West. There are approximately 950 employees, of which approximately 450 are teachers.

4. The School Board of Monroe County is comprised of five elected district representatives. The five current members of the School Board for the 1986–1987 and 1987–1988 school years are: Robert R. Padron; Sydney Matthews; Lee G. Ganim, [appointed December 31, 1986 to replace Ed Adair who died on December 26, 1986]; Dr. Geraldine T. Caron, Vice–Chairperson; and Ruth Alice Campbell, Chairperson.

5. During the 1984–1985 and 1985–1986 school years, the Monroe County School Board members were: Ed Adair; Ruth Alice Campbell; Robert Padron; Dr. Geraldine Caron; and Sydney Matthews.

6. Armando J. Henriquez, Ph.D., is and has been the Superintendent of the Monroe County School District since 1969, having been elected to consecutive four-year terms since that time.

7. Defendant KERRY HIGHSMITH is Director/Team Leader of the Business Management Complex, the administrative side of the Monroe County School District. He has held that position since 1977. Mr. Highsmith reports directly to Superintendent Henriquez.

8. As Director/Team Leader of the Business Management Complex, Mr. Highsmith is responsible for overall management of all non-instructional departments in the School District such as maintenance, transportation and food service. Mr. Highsmith directly supervises the Director of Food Service/Purchasing, Director of Finance, Director of Payroll, Director of Data Processing, and Director of Maintenance.

9. Mr. Highsmith has himself performed the job duties of Director of Transportation since April, 1986. As Director of Transportation, Mr. Highsmith supervises Mr. Herb Kebschull, Supervisor of Transportation, and Alana Gallaher, the Route Clerk, who schedules the school bus runs.

10. Plaintiff was hired by Defendant School Board on September 23, 1968, in the position of bus driver. In 1970, Plaintiff

was promoted to Acting Cafeteria Manager at Marathon High School. Plaintiff was appointed as Cafeteria Manager in 1972. Plaintiff's job as Cafeteria Manager was in addition to her duties as a bus driver.

11. In September of 1973, Plaintiff resigned as Cafeteria Manager, but continued to perform her duties as a bus driver.

12. In July of 1978, Plaintiff applied for the position of Assistant Director of Transportation. Mr. Highsmith and Mr. Paul Keller, Director of Maintenance, Transportation and Custodians, chose Plaintiff for the position of Assistant Director of Transportation from a total of eleven (11) applicants—seven (7) males and four (4) females.

13. David Kolhage, one of the applicants for the position of Assistant Director of Transportation, had previously held the Assistant Director position from 1967 to 1973. Mr. Kolhage was not recommended by Mr. Highsmith for the Assistant Director position in 1978 because Mr. Highsmith believed that Mr. Kolhage had not done a good job during the time he previously had served as Assistant Director. Specifically, Mr. Highsmith felt that Mr. Kolhage had demonstrated that he lacked the interpersonal skills necessary to properly do the job because Mr. Kolhage had had problems dealing with personnel supervised by him (bus drivers, mechanics, etc.) and had also been unable to work cooperatively with administrative personnel (principals and School District personnel).

14. Mr. Highsmith believed that two of the applicants in 1978 were qualified for the position—Plaintiff and a Mr. Horatio Castillo. However, Mr. Highsmith decided that he preferred Plaintiff for the position because of her experience as a bus driver in the transportation department and, in July or August of 1978, Mr. Highsmith recommended to Dr. Henriquez that Plaintiff be promoted to the position of Assistant Director of Transportation.

15. Based upon Mr. Highsmith's recommendation, Dr. Henriquez nominated Plaintiff to Defendant School Board, which on August 7, 1978 approved her appointment to be Assistant Director of Transportation for the 1978–1979 school year.

16. Plaintiff held the position of Assistant Director of Transportation for the school years 1978–1979, 1979–1980, and 1980–1981. She directly supervised the Office Manager, Norma Renner; the Route Clerk, Marie Curry; the Supervisor of the Upper Keys, Elsada Parker; and the Supervisor of the Middle Keys, Mary Owens.

17. Defendant CALVIN KING was hired by Defendant School Board in April, 1980, in the position of Director of Maintenance, Transportation and Custodians. Mr. King replaced Paul Keller, who retired.

18. From April, 1980 until Plaintiff's position as Assistant Director of Transportation was abolished, Mr. King supervised her. During this same time, Mr. King also supervised Mr. Hector Sanchez, Assistant Director of Custodians; Mr. Gene Baker, Assistant Director of Maintenance; and Mr. Roland Graz, Chief Mechanic.

19. During the time Plaintiff was Assistant Director of Transportation, Plaintiff generally did a competent job running the Transportation Department. Nevertheless, she had serious problems in her relationships and dealings with other school district personnel. Mr. Highsmith received numerous complaints about Plaintiff. Many individuals (bus drivers and mechanics) supervised by Plaintiff complained to Mr. Highsmith about her abrasive manner, favoritism, and her general mistreatment of them. For example, on one occasion during the 1980–1981 school year, a group of school bus drivers who worked in the Key West area conducted a meeting and designated drivers Orea Aravello, Gilda Rojas and Nick Sanchez to represent them and to bring to management's attention a variety of complaints about Plaintiff's mistreatment of the bus drivers. Aravello, Rojas and Sanchez then met with Mr. Highsmith and told him that Plaintiff was overbearing, unreasonable and harsh in her dealings with them, that Plaintiff humiliated employees in the presence of other employees, that she showed favoritism, and that the drivers were very upset with her. Following this meeting, Mr. Highsmith met

with Plaintiff, advised her of the complaints and counseled her about her poor management style and her lack of interpersonal skills. He specifically discussed the employee complaints with Plaintiff and made suggestions to Plaintiff about ways to improve her relationship with the employees supervised by her.

20. During the time Plaintiff was Assistant Director of Transportation, Mr. Highsmith also received numerous complaints from school principals and assistant principals about Plaintiff's bad attitude in her dealings with them, about her lack of cooperation, about her adversarial and dictatorial nature, and about the poor morale of the employees supervised by Plaintiff (i.e., bus drivers who were based at the principals' schools).

21. During Plaintiff's last year (1980–1981) as Assistant Director of Transportation, a particularly serious dispute erupted between her and Principal Robert Walker of Horace O'Bryant School. A comparatively large number of drivers serviced Mr. Walker's school. Mr. Walker and his Assistant Principals (Robert Menendez and Robert Roberts) had very close dealings with their bus drivers. According to Mr. Walker, during the time Plaintiff was Assistant Director of Transportation, his drivers constantly complained to him and to his Assistant Principals about Plaintiff's mistreating them, and he felt their morale was very low. On or about February 3, 1981, Mr. Walker received a memorandum from Plaintiff in which Plaintiff claimed that bus drivers were complaining about a lack of cooperation on the part of Walker's staff in dealing with discipline of students for problems on buses. On the same day, Mr. Walker received a second memorandum from Plaintiff requesting a meeting about the matter. Mr. Walker was incensed, for two reasons. First, the management style of the School District is very informal, and Mr. Walker felt that Plaintiff should have just picked up the telephone and talked to him about it instead of sending him memoranda. Second, Plaintiff had sent copies of her memoranda to Mr. Highsmith and to Dr. Henriquez. Mr. Walker was particularly upset by Plaintiff's sending of copies of the memoranda to Dr. Henriquez and Mr. Highsmith before Plaintiff had attempted to resolve the alleged problem with Mr. Walker. Mr. Walker had his staff retrieve their records about the student referrals and agreed to have the meeting with Plaintiff and the bus drivers. At the meeting, Mr. Walker and his staff shared the information regarding student referrals with the drivers, and asked if the drivers had any problems with the way the situation was being handled. Every driver who responded said they didn't have any problems and also stated that Messrs. Roberts and Menedez were very good in their jobs. After the meeting, several drivers approached Mr. Walker and told him that "Mira was the problem." At that time, Mr. Walker forcefully told Plaintiff that in the future she should get her facts straight before she complained to him about a problem, and that if she had a complaint, she should just pick up the telephone and talk to him about it, not write him memoranda and send copies to the Superintendent. Mr. Walker later related what had happened to Mr. Highsmith.

22. On numerous occasions when Plaintiff was Assistant Director of Transportation, Mr. Highsmith counseled her about the complaints he had received from employees and principals. Nevertheless, Plaintiff's performance in that regard did not improve. Mr. Highsmith continued to receive complaints from employees supervised by Plaintiff and from principals about Plaintiff's mistreatment of employees and her inability to get along with principals.

23. Plaintiff's evaluations reflect the problems which she had in her dealings with other district personnel. On Plaintiff's evaluation at the end of the 1978–1979 school year, Mr. Highsmith wrote under "Recommendations" that Plaintiff had to

"Further develop skills in human relations and interpersonal relations. These skills are vital if you are to be able to deal effectively with such diversified groups as principals, school personnel, bus drivers, parents, students, and mechanics."

24. Following the 1979–1980 school year, Mr. Highsmith again evaluated Plaintiff and recommended that she

"Continue to develop interpersonal and human relations skills as well as other administrative and supervisory skills."

25. Following the 1980–1981 school year, Mr. Highsmith again evaluated Plaintiff. This evaluation did not contain any negative remarks regarding Plaintiff's need to improve her interpersonal skills. Mr. Highsmith testified that Plaintiff's performance problems involving her poor interpersonal skills had actually been worse in 1980–1981 than in prior years. For example, the delegation of employees who complained to Mr. Highsmith had done so during the spring of 1981. Further, the incident involving Principal Walker had occurred in February of 1981. In fact, in the latter part of 1981, Mr. Highsmith was giving serious consideration to removing Plaintiff from her position because of all of the problems that had occurred involving Plaintiff during the 1980–1981 school year (and during prior years). Nevertheless, Mr. Highsmith credibly explained that, at the time he evaluated Plaintiff in June of 1981, he did not make any negative remarks regarding Plaintiff's interpersonal skills because the position had already been abolished, and he saw no point in criticizing Plaintiff's performance at that time.

26. Plaintiff also received an evaluation from Mr. King at the conclusion of the 1980–1981 school year. In that evaluation, Mr. King generally gave Plaintiff high marks, but gave Plaintiff her lowest score on that evaluation in the category of "self-control and poise—being able to control ones temper and calmness of manner when faced with difficult situations; a control of ones self, ones actions, ones feeling." In this regard, the consensus of all the witnesses who testified at the trial was that, during the time Plaintiff was Assistant Director of Transportation, she had done a fairly competent job insofar as the operational aspects of the position were concerned. At the time Mr. King evaluated Plaintiff, he had been with the School Board for only one year. During that period of time, Mr. King was responsible for three areas of operation: Maintenance, Transportation (Plaintiff's operation) and Custodians. The Monroe County School District geographically extends from Key West north to Key Largo, a distance of approximately 140 miles. During the one year he supervised the Plaintiff, Mr. King spent about eighty percent of his time involved in maintenance matters. Mr. King's contacts with the Plaintiff during that year were infrequent—he would see her only once or twice a week, for short periods of time. At the time Mr. King performed his evaluation of Ms. Mira, he was aware that some of the mechanics, (including the Mechanics' Supervisor), and some of the bus drivers had had problems with the manner in which Plaintiff treated them. However, Mr. King was not aware of the extent of the other problems involving Plaintiff because the principals who had experienced problems in dealing with Plaintiff (and who were aware of problems involving Plaintiff and the bus drivers) had brought such matters directly to the attention of Mr. Highsmith, who had been a former principal. Simply put, at the time Mr. King evaluated Ms. Mira, he was not aware of all of the problems involving Plaintiff. Accordingly, I conclude that Mr. King's evaluation of Plaintiff is of no probative value in this matter.

27. During Plaintiff's tenure as Assistant Director of Transportation, the morale of the employees she supervised was very low, and said employees openly and frequently voiced their complaints about Plaintiff to Administrators in the School District, including Dr. Henriquez, Mr. Highsmith and school principals.

28. Two principals testified about the repeated employee complaints they entertained or overheard from the bus drivers about Plaintiff's mistreatment of them, demonstrating the low morale in the transportation department. They also testified that they informed Mr. Highsmith of those complaints on several occasions.

29. In May of 1981, the Monroe County School District was notified that the federal government would no longer provide ap-

proximately $900,000.00 in "impact funding" (funds to compensate the recipient School District for being unable to tax the federal land within its jurisdiction) to the District. As a result of the loss of federal impact funding and in order to reduce its operating costs to offset the loss of funds, Defendant School Board eliminated the following administrative job positions, effective July, 1981: Assistant Director of Transportation, Assistant Director of Custodians, and Director of Security. Plaintiff was the Assistant Director of Transportation. The other two position which were abolished were held by males. Plaintiff did not contend that the position of Assistant Director of Transportation was eliminated in 1981 for discriminatory reasons.

30. Subsequent to the elimination of her position as Assistant Director of Transportation, Plaintiff remained in the employ of the School Board as a bus driver and became Lower Keys Area Transportation Supervisor. This supervisory position was not advertised; instead, it was offered only to Plaintiff. Plaintiff's position as Lower Keys Area Transportation Supervisor was in addition to her full-time job as a bus driver.

31. Combining the two positions that Plaintiff held as Lower Keys Area Transportation Supervisor with that of bus driver, Plaintiff earned approximately the same money as she formerly did as Assistant Director of Transportation.

32. In February, 1982, Plaintiff resigned as Lower Keys Area Transportation Supervisor but remained employed as a bus driver.

33. During the 1983–1984 and 1984–1985 school years, Plaintiff was employed by Defendant School District as a bus driver and substitute teacher.

34. In June, 1984, Defendant School Board reinstated the position of Assistant Director of Transportation and advertised that job opening in the June 11, 1984 edition of the School District's weekly newspaper, "Tropic Topics."

35. Six persons submitted applications for the Assistant Director of Transportation position: Plaintiff; William Curry; Joyce Arata; Marie Curry (no relation to William Curry); Norma Renner; and Beatrice Vasquez. Ms. Renner submitted her application because Mr. King encouraged her to do so.

36. Mr. Highsmith was familiar with the work experience of Plaintiff, Renner, Vasquez and Marie Curry because all of them had worked in the Transportation Department, which he had directly supervised since 1981. Mr. Highsmith was similarly familar with Ms. Arata because she had held a "CETA" position under Mr. Highsmith's supervision for several years. Mr. Highsmith did not believe that Ms. Vasquez, Ms. Curry and Ms. Arata were qualified for the position because they lacked supervisory/managerial experience. Ms. Renner withdrew her application when she learned that Mr. William Curry had applied for the position.

37. Mr. Highsmith determined that he did not want to again promote Plaintiff to the position of Assistant Director of Transportation because of the many personnel problems Plaintiff had caused during the time she previously had held the position. Mr. Highsmith had essentially done the same thing in 1978 when he had chosen Plaintiff to be the Assistant Director of Transportation instead of David Kolhage, who previously had held the position. Mr. Highsmith did not consider the other female applicants to be qualified for the position because, as was stated above, they had worked for him for several years and he was personally familiar with their abilities and with their limitations.

38. After all of the applications were in, Mr. Highsmith determined that William Curry was the only candidate Mr. Highsmith would seriously consider for the position. Mr. Curry had been informally recommended very highly by Glynn Archer, Mr. Highsmith's counterpart on the "instructional" side of the school system. Mr. Archer had known Mr. Curry for many years. Mr. Curry was also highly recommended by Norma Renner, who withdrew her application after Mr. Curry applied. More importantly, Mr. Highsmith was looking for an experienced manager of people,

and Mr. Highsmith's review of Mr. Curry's work experience disclosed that he had an impressive background as an administrator and supervisor, particularly in the field of personnel matters.

39. Mr. Highsmith told Mr. King that he (Highsmith) felt that William Curry was the only realistic candidate for the position, but nonetheless instructed Mr. King to interview all of the applicants as a courtesy. Mr. King did so, and reported to Mr. Highsmith that he agreed with Mr. Highsmith that William Curry was highly qualified for the job. Mr. Highsmith thereupon recommended to Dr. Henriquez that Mr. William Curry be given the job, and Dr. Henriquez accepted that recommendation.

40. Mr. Curry initially accepted the offer of employment from the School Board, but shortly thereafter decided not to take the job.

41. Mr. Highsmith did not consider the other applicants for the Assistant Director of Transportation job opening (including Plaintiff) to be qualified for the position. Therefore, Defendant School Board did not fill that position at that time.

42. Plaintiff testified at trial that, during her interview with Mr. King in June of 1984, he told her that some male employees didn't like working for a female supervisor and that some people had told him they would quit if Plaintiff were again to be promoted to be Assistant Director of Transporation. Plaintiff also testified that she knew at that point that a female would not be given the position, and that she felt distressed about the matter. However, on cross-examination, Plaintiff was reminded that, at her deposition which was taken in May of 1987, she testified regarding her interview with Mr. King that: "Well, we basically had a good interview. I felt really good when I left there...." At the trial, Mr. King denied having made any such remark to Plaintiff during the course of the interview with her. Mr. King further testified that he had had a conversation with Plaintiff around August of 1984 at which time Plaintiff had inquired as to the reason she had not obtained the posi-

tion. Mr. King testified that he told Plaintiff at that time that there were a lot of people who did not want to work for her and that some had said they would quit if she got the job. The Court credits Mr. King's version of the events on this point. Plaintiff's testimony regarding the matter was somewhat contradictory. Also, the Court did not find Mr. King to be an unintelligent person, and the Court does not believe that Mr. King would have made the type of statement attributed to him ·by Plaintiff. Next, Mr. King had encouraged another female, Norma Renner, to apply for the Assistant Director position. In summary, after hearing the testimony on this point, the Court credits Mr. King based upon the above and upon his demeanor while testifying and his general forthright manner, and finds that he did not make the statement attributed to him by Plaintiff or any similar remark indicating sex discrimination. Next, both Mr. King and Mr. Highsmith credibly denied that Mr. King had ever told Mr. Highsmith that males in the Transportation Department did not want to work for a female supervisor. Finally, the credible evidence demonstrated that Mr. Highsmith made the decision not to promote Plaintiff based upon complaints made directly to him about Plaintiff by drivers, mechanics and principals.

43. In October, 1984, Mr. Highsmith contracted with Mr. Donald Washbish to perform consulting services for Defendant School Board on a part-time basis under a three-month, renewable contract. Mr. Washbish's contract was renewed through June of 1986. Under the consulting contract, Mr. Washbish was to supervise and to direct the operation of the School District's transportation department. He was responsible for scheduling vehicles, establishing and monitoring bus routes, and supervising and evaluating bus drivers, mechanics, and other transportation department employees.

44. Mr. Highsmith was very familiar with Mr. Washbish's job qualifications because Mr. Washbish, a retired employee of the School District, had worked with Mr. Highsmith for approximately fourteen

years. Moreover, for at least one (1) year prior to October, 1984, Mr. Washbish had been employed as the manager of the security company that provided guard services for the School District. Thus, Mr. Highsmith, who was responsible for school security, communicated with Mr. Washbish on a weekly basis and was favorably impressed with the quality of Mr. Washbish's job performance. When Mr. Highsmith became aware that Mr. Washbish's employer was closing its local security office, thereby eliminating Mr. Washbish's job, Mr. Highsmith offered him a consulting services contract with the School District. In selecting Mr. Washbish, Mr. Highsmith was well aware of, and respected, Mr. Washbish's interpersonal skills as evidenced during Mr. Washbish's five (5) years with the School District as a student guidance counselor, and, following his retirement, during his service with a Florida state agency as an intake counselor working with veterans. Because of Mr. Washbish's prior experience working with people, Mr. Highsmith believed that he had the interpersonal skills that Mr. Highsmith felt were needed to supervise the transportation department.

45. Prior to April, 1986, Mr. Washbish reported to Mr. King. After that date, Mr. Highsmith became Director of Transportation and directed Mr. Washbish.

46. On August 8, 1985, Plaintiff was appointed to be a permanent substitute teacher at Key West High School during the 1985–86 school year. Mr. Highsmith recommended her for this appointment.

47. In August, 1985, Plaintiff resigned her bus driving duties because of a prior knee injury, but remained employed as a permanent substitute teacher.

48. One day in late June of 1986, Mr. Highsmith learned that Mr. Washbish had told other employees in the Transportation Department that he was "fed up" and that he was quitting, at which point Mr. Washbish supposedly had walked out of the office and left. Upon learning this, Mr. Highsmith quickly prepared a letter accepting Mr. Washbish's resignation, and had the letter delivered to Mr. Washbish. Mr. Highsmith did this because he had not been satisfied with Mr. Washbish's performance. After Mr. Highsmith's letter was received by Mr. Washbish, Mr. Washbish contacted Mr. Highsmith and attempted to rescind his resignation, but Mr. Highsmith refused to allow Mr. Washbish to do so.

49. On July 14, 1986, Mr. Herb Kebschull, who had been employed by the School District for about ten years and who was then under a continuing contract, became Supervisor of Transportation, taking over Mr. Washbish's duties in the Transportation Department on a part-time basis. As the [JTPA] Administrator/Project Director, Mr. Kebschull has divided his working time between transportation duties (one-fourth time) and a federally-funded Job Training Program in the Monroe County School District ["JTPA"] (three-fourths time).

50. The Assistant Director of Transportation position has not been re-established or filled since it was abolished in 1981.

51. On or about June 17, 1985, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission [EEOC] (Charge No. 046851140). Plaintiff filed an amended charge in Case No. 046851140 on August 13, 1985.

52. No prior charge of sex discrimination has been filed against Defendant School Board.

53. The Complaint in the instant action was filed on March 2, 1987, and amended on March 20, 1987.

## CONCLUSIONS OF LAW

I. The Court has jurisdiction of the subject matter of this action and the parties herein pursuant to 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343. All procedural prerequisites for suit under Title VII have been properly fulfilled by Plaintiff.

II. Defendant Monroe County School Board is an employer within the meaning of Title VII; and Plaintiff is an employee within the meaning of Title VII.

III. Plaintiff's claim under Title VII is limited by 42 U.S.C. § 2000e–5(e) to the date 300 days prior to the filing of her charge of discrimination with the EEOC.

IV. The allegations regarding Plaintiff's promotions are based upon her claims of disparate treatment. The central focus in an individual disparate treatment case is whether Defendants treated Plaintiff less favorably than others because of her sex. Critical to Plaintiff's case is proof that Defendants' motive was discriminatory. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Ferguson v. Veterans Administration*, 723 F.2d 871 (11th Cir.1984), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984); *Lee v. Russell County Board of Education*, 684 F.2d 769 (11th Cir.1982). Disparate treatment claims (such as that herein) may be distinguished from claims brought pursuant to a disparate impact theory. Disparate impact cases involve an employment practice which is facially neutral in its treatment of different groups but which, in fact, falls more harshly on one group than another. Under a disparate impact theory, proof of discriminatory motive is not required. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–336 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977).

V. The ultimate burden of persuading the trier of fact that Defendants intentionally discriminated against Plaintiff remains at all times with Plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

VI. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine, supra*, the Supreme Court established a three-part test setting forth the burden of proof for a plaintiff alleging discriminatory treatment ("disparate treatment").

VII. When alleging disparate treatment in a failure to promote case, Plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. This requires a showing that: (a) Plaintiff is a member of a protected class (female); (b) Plaintiff was qualified for the position and/or satisfactorily performed the duties of the position; (c) Plaintiff was in fact denied promotion; and (d) Plaintiff was treated differently by Defendants than similarly situated employees who were not members of the protected class. *Lee v. Russell County Board of Education*, 684 F.2d 769, 773 (11th Cir. 1982).

VIII. Once Plaintiff has proven a *prima facie* case, the burden shifts to Defendants to articulate some legitimate, non-discriminatory reason for its employment decision. Defendants' burden is one of production, not of proof. Defendants need only present evidence that Plaintiff was not promoted for a legitimate, non-discriminatory reason. It is sufficient if Defendants raise a genuine issue of fact as to whether they discriminated against Plaintiff. *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir.1983); *Lee v. Russell County Board of Education*, 684 F.2d 769, 773 (11th Cir.1982).

IX. Once a defendant has articulated some legitimate, non-discriminatory reason for its employment decision, the burden of proof shifts to the plaintiff to prove that the defendant's articulated reason is a pretext. The required showing of pretext consists of proof by a preponderance of evidence "that the legitimate reasons offered by defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

X. The *McDonnell–Douglas* test, however, is not the exclusive method of proving a case of disparate treatment. A claim of sex discrimination can be proven either by direct evidence or circumstantial evidence. *Thompkins v. Morris Brown College*, 752 F.2d 558 (11th Cir.1985). Where a case of discrimination is proven by direct evidence, it is incorrect to rely on a *McDonnell–Douglas* rebuttal. *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir.1982). As the court

in *Thompkins* explained, "This is so because circumstantial evidence is used to create an inference of discrimination under *McDonnell-Douglas,* while no such inference is required in the case of direct evidence. Thus, once an unlawful motive is proven by direct evidence, the defendant can rebut it only by a preponderance of the evidence that the same decision would have been reached even absent the presence of that motive as a factor." *Thompkins,* 752 F.2d at 563. As the court stated in *Thompkins,* when direct evidence of discrimination is introduced, the lower court must, as an initial matter, specifically state whether it believes plaintiff's proffered direct evidence of discrimination. *Thompkins,* 752 F.2d at 564.

XI. Plaintiff failed to carry her burden of proving a *prima facie* case of sex discrimination with respect to her failure to obtain the promotions involved here.

■ XII. There is no credible, "direct" evidence of discrimination in this case regarding any of the issues involved. In this regard, the Court finds that Mr. King did not make the remark attributed to him by Plaintiff to the effect that "some male employees in the Transportation Department didn't want to work for a female supervisor." The Court credits Mr. King's denial of the foregoing remark and any other statements attributed to him by Plaintiff indicating discrimination against her because of her sex. Based on Mr. King's demeanor while testifying, the Court finds him to have been credible and forthright in his testimony in general and with respect to this matter in particular. Further, the credible evidence showed that Mr. King encouraged a woman, Norma Renner, to apply for the position. Next, Plaintiff did not impress the Court as being a credible witness on this point, as her testimony regarding this matter was somewhat contradictory. In making this determination, the Court does not find that Plaintiff's testimony on this point was intentionally untruthful. Instead, the Court finds that Plaintiff was mistaken in her recollection of the matter.

■ XIII. Even were the Court to credit Plaintiff's testimony that King made such a comment, Plaintiff has failed to establish that Mr. King made, or effectively influenced, the decision not to promote Plaintiff to Assistant Director of Transportation. The Court has found that Mr. Highsmith was solely responsible for the decision that Plaintiff was unable to handle the supervisory responsibilities associated with the Assistant Director position, and that he had made that determination based upon the many complaints which had been made directly to him. Thus Mr. King's interviewing of the applicants, including Plaintiff, was not a factor in Mr. Highsmith's decision not to promote Plaintiff to be Assistant Director. Because Mr. King had no effective role in the decision not to promote Plaintiff to the Assistant Director of Transportation position, his motivation is irrelevant. Thus, any remarks which Plaintiff alleges were made to her by him during the interview process are not causally connected to her failure to obtain the position. *Aikens v. Bolger,* 33 Fair Empl.Prac.Cas. (BNA) 1697 (D.D.C.1984) (postmaster's derogatory racial remarks did not warrant a finding that plaintiff was denied a promotion on account of his race where plaintiff failed to prove remarks related to the selection process); *Adams v. United Airlines,* 578 F.Supp. 26 (N.D.Ill.1983) (discriminatory comments by supervisors not involved in plaintiff's discharge are not evidence of employer's discriminatory motive); *Gillard v. Sears, Roebuck & Co.,* 32 Fair Empl.Prac.Cas. (BNA) 1274, 1276 (E.D.Pa. 1983) (plaintiff could not prove defendant's discriminatory motive by showing discriminatory statements occurred in the workplace where she failed to prove nexus between statements and her discharge).

■ XIV. The other credible evidence fails to establish a *prima facie* case of sex discrimination as to Plaintiff. First, the evidence shows that the position of Assistant Director of Transportation has not been re-established since it was abolished by the School Board in 1981. Next, Plaintiff failed to establish that she was qualified for the position. An important aspect of the Assistant Director's job is dealing with

employees, principals and administrators in an effective manner. Plaintiff admitted at trial that a person who could not effectively deal with employees and principals should not hold the position of Assistant Director of Transportation. During the time (1978–1981) that Plaintiff had been Assistant Director of Transportation, Plaintiff had demonstrated an inability to effectively perform that aspect of the job. Also, Plaintiff has not shown that she was treated differently because of her sex. Instead, the credible evidence shows that, in a like situation, a (former) male employee, David Kolhage, was treated exactly the same as was Plaintiff. That is, Mr. Kolhage had served as the Assistant Director of Transportation from 1967 to 1973. After that, Mr. Kolhage had gone on to serve as the Director of Transportation for another, larger school district in the state of Florida. In 1978, Mr. Kolhage had applied to again be the Assistant Director of Transportation for Defendant School Board. At that time, Mr. Highsmith decided to promote Plaintiff to the position instead of rehiring Mr. Kolhage. The principal reason Mr. Highsmith did not give the job to Mr. Kolhage was that, during the time Mr. Kolhage had previously held the job, he had demonstrated that he lacked the interpersonal skills necessary to properly perform the job.

XV. Discrimination consists of treating like cases differently. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–336 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977); *Andre v. Bendix Corp.,* 841 F.2d 172, 46 Fair Empl.Prac.Cas. (BNA) 342, 345–46 (7th Cir.1988); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1186–87 (11th Cir.1984); *Williams v. Pepsi–Cola Bottling Group,* 46 Fair Empl.Prac.Cas. (BNA) 351, 354 (E.D.Wis.1988); *Campbell v. Greyhound Lines Inc.,* 669 F.Supp. 409, 410–11 (S.D.Fla.1987). In this case, the evidence shows that a male was treated exactly the same as was Plaintiff in similar circumstances. Further, it was Mr. Highsmith who made the decisions involved in both instances. That is, Mr. Highsmith made the decision in 1978 that the job would not be given to Mr. Kolhage. At

that time Mr. Highsmith decided to promote Plaintiff to the position out of a field of eleven applicants, seven of whom, including Mr. Kolhage, were males. In this case it was also Mr. Highsmith who made the decision not to again promote Plaintiff to the position involved here. Accordingly, no *prima facie* case of discrimination has been presented. *See Campbell v. Greyhound Lines, Inc.,* 669 F.Supp. 409, 411 (S.D.Fla.1987) (fact that defendant had earlier allowed plaintiff to return to work makes plaintiff's claim that defendant thereafter refused to permit him to return to work due to his race "particularly suspect").

■ XVI. Even assuming that Plaintiff has proven her *prima facie* case, Defendants have come forward with an abundance of evidence which demonstrates that Plaintiff did not receive the promotion because of legitimate, non-discriminatory reasons. In selecting employees for promotion/transfer to managerial/supervisory jobs, some subjective judgments are often essential and permissible. *See, Grigsby v. Reynolds Metals Co.,* 821 F.2d 590 (11th Cir.1987); *Casillas v. United States Navy,* 735 F.2d 338, 345 (9th Cir.1984); *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98 (11th Cir.1982); *Rogers v. International Paper Co.,* 510 F.2d 1340, 1345 (8th Cir.1975) *rev'd on other grounds,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975). *See also Robles v. Golden,* 44 Fair Empl.Prac.Cas. (BNA) 157 (1986) (employer's judgment not to promote plaintiff based on lack of supervisory abilities upheld despite statistical evidence of lack of minority hiring). The Assistant Director position sought by Plaintiff in this case was a supervisory one, and thus subjective judgments properly were involved.

XVII. Defendants presented credible evidence of numerous employee complaints regarding Plaintiff's poor job performance by way of testimony from School District personnel who received said complaints. In *Mazzella v. RCA Global Communications, Inc.,* 642 F.Supp. 1531 (S.D.N.Y. 1986), *aff'd,* 814 F.2d 653 (2d Cir.1987), the court, in dismissing the plaintiff's Title VII

charge that she was discharged because she was pregnant, specifically relied on testimony by plaintiff's supervisors regarding employee complaints about plaintiff's poor performance. The supervisors' testimony supported the court's legal conclusion that defendant had reason to believe that plaintiff's performance was unsatisfactory. In rejecting the plaintiff's contention that the supervisors' testimony was inadmissible hearsay, the court explained that the evidence of employee complaints was not admitted to prove that the incidents complained of occurred, but to prove that plaintiff's supervisors had in fact received complaints about her poor work performance. Having established that complaints were received, the defendant was entitled to rely on said complaints in articulating a nondiscriminatory reason for its personnel action. The court found that plaintiff could not prevail simply by establishing that the incidents complained of did not occur or that she was a "good employee." As the court noted, because the ultimate issue in a sex discrimination case is the defendant's motivation, the plaintiff must show that the defendant's reliance on employee complaints it received was a pretext for discrimination.

XVIII. The evidence clearly shows that Plaintiff was not promoted to the Assistant Director of Transportation position by Mr. Highsmith because of Plaintiff's past, poor supervisory performance while she had held the same position during 1978–1981. During that period of time Mr. Highsmith received numerous complaints from employees, principals and administrators regarding Plaintiff's abrasive disposition, her lack of diplomacy and generally inadequate interpersonal abilities. Plaintiff had been counseled and warned by Mr. Highsmith regarding the foregoing problems during the time Plaintiff had been Assistant Director of Transportation. Mr. Highsmith was a candid, forthright witness. The testimony of all concerned in this matter (including Plaintiff and one of her witnesses whose deposition was admitted at trial) was that Mr. Highsmith was and is a truthful person. Mr. Highsmith credibly testified that the sole reason he did not again promote Plaintiff to the position of Assistant Director of Transportation in 1983 was that he did not believe, based upon Plaintiff's prior performance in the Assistant Director's position, that Plaintiff possessed the interpersonal skills which were necessary to properly perform the duties of Assistant Director of Transportation. Mr. Highsmith credibly testified that Plaintiff's sex had absolutely nothing to do with his decision in that regard. That such testimony was truthful is evinced by the fact that, as was stated previously, it was Mr. Highsmith who originally promoted Plaintiff to the Assistant Director of Transportation position in 1978 out of a field of a total of eleven applicants, including David Kolhage, who had previously served as the Assistant Director of Transportation for Defendant School Board. As was found above, Mr. Highsmith did not give the position to Mr. Kolhage at that time because he believed that, based upon Mr. Kolhage's prior performance as Assistant Director of Transportation, Mr. Kolhage also lacked the interpersonal skills necessary for a proper performance of the job. In summary, the Court credits and accepts as true Mr. Highsmith's testimony in general and in particular regarding his motivation in not considering Plaintiff for the promotions involved here.

XIX. In light of the foregoing, the Court concludes that Plaintiff failed to establish that Defendants discriminated against her on account of her sex. *See Verniero v. Air Force Academy School District No. 20,* 705 F.2d 388 (10th Cir. 1983) (although the court found that the plaintiff was qualified for positions involved in two promotions, the court dismissed her Title VII claim based upon the subjective evaluations of the hiring committee that Plaintiff was unable to be flexible and to work with the faculty and with the community. The court noted that subjective evaluations played a legitimate part in an employer's determination as to whether an employee has the ability to get along with others, and found that such evaluations were a legitimate business reason for the nonselection of the plaintiff in that

case); *Robinson v. Dupont Co.*, 33 Fair Empl.Prac.Cas. (BNA) 880 (D.C.Del.1979) (female employee's termination and her failure to obtain a promotion were due to her personality problems that caused office conflicts and affected her working relationship with others); *McCollum v. Bolger*, 794 F.2d 602 (11th Cir.1986), *cert denied*, —— U.S. ——, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987) (plaintiff's suspension was found not to be on account of sex discrimination but rather because of her inability to get along with her superiors and because of her adversarial personality); *Judge v. Marsh*, 649 F.Supp. 770 (D.C.D.C.1986) (plaintiff's failure to be eligible for promotion was not due to sex but was attributable to defendant's reliance on staff complaints about plaintiff's abrasiveness, difficult nature, and manner in which she performed her job; the court so held despite plaintiff's evidence that certain employees spoke highly of her personal and professional skills, finding that said evidence did not counter defendant's evidence that various staff members had complained about their difficulty in interacting with plaintiff); *Singh v. Bowsher*, 609 F.Supp. 454 (D.C.D.C.1984) (no race discrimination found where plaintiff was denied five promotions because he did not have an outgoing personality, was too serious, and could not communicate well with others); *Lyons v. Boorstin*, 44 Fair Empl.Prac.Cas. 1006 (D.C.D.C.1986) (judgment and personality can be valid, legitimate and nondiscriminatory criteria for high level promotions; evidence showed that defendant did not promote plaintiff because of the selecting official's subjective judgment that plaintiff, a female attorney, was uncooperative and unable to get along with others, had difficulty accepting direction from supervisors, and was unable to accept policy decisions as final).

XX. The Court finds and concludes that, based upon competent and credible evidence presented by Defendants at trial, Defendants did have legitimate and non-discriminatory reasons not to promote Plaintiff to the Assistant Director position. The Court fully credits the reasons advanced by Defendants as to why Plaintiff was not promoted to Assistant Director. Mr. Highsmith did not promote Plaintiff because Mr. Highsmith believed that Plaintiff lacked the necessary interpersonal skills for the job.

XXI. Plaintiff has failed to prove that Defendants' articulated reasons for not promoting her were pretextual. In this regard, Plaintiff failed to produce any evidence, let alone proof by a preponderance of the evidence, that the reasons for her non-promotion articulated by Defendants were merely a pretext for discrimination.

XXII. Mr. Highsmith and Mr. King were very credible witnesses. The Court believes their testimony that Plaintiff's sex had absolutely nothing to do with the decision not to promote her to Assistant Director of Transportation.

XXIII. Plaintiff has not proven by a preponderance of the evidence that Defendants violated Title VII.

XXIV. Judgment will be entered by the Court in accordance with the foregoing Findings of Fact and Conclusions of Law.